# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: ASBESTOS LITIGATION )
)
GERALD L. HICKMAN, )
)
      Plaintiff, )
)
      v. )     Civil Action No. 16-308-LPS-SRF
)
A. W. CHESTERTON COMPANY, et al., )
)
      Defendants. )

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

Presently before the court in this asbestos-related personal injury action are the motions

for summary judgment of Defendants BorgWarner Morse TEC LLC[1] ("BorgWarner") (D.I. 140),

Clayton Industries ("Clayton") (D.I. 163), Foster Wheeler LLC ("Foster Wheeler") (D.I. 158),

Gardner Denver Inc. ("Gardner") (D.I. 142), General Electric Company ("GE") (D.I. 160),

Genuine Parts Company ("GPC") (D.I. 145), Mack Trucks Inc. ("Mack Trucks") (D.I. 151),

Marotta Controls Inc. ("Marotta") (D.I. 192), National Automotive Parts Assoc. ("NAPA") (D.I.

145), Navistar, Inc.[2] ("Navistar") (D.I. 153), and Neles-Jamesbury Inc. ("Neles-Jamesbury")

(D.I. 144) (collectively, "Defendants"). Plaintiff Gerald Hickman ("Plaintiff") did not respond to

these motions. As indicated in the chart *infra* and for the reasons that follow, the court

recommends GRANTING Defendants' motions for summary judgment.

---

[1] BorgWarner Morse TEC LLC is a successor by merger to Borg-Warner Corporation. (D.I. 141 at 4)

[2] Navistar, Inc. has changed its name several times; one of its previous names was "International Harvester Company," referred to frequently simply as "International" or "International Harvester." (D.I. 166 at 1 n.1) Navistar was a manufacturer in part and assembler of trucks and buses under the brand name "International." (*Id.*)

| Defendant | Motion for Summary Judgment |
|---|---|
| BorgWarner Morse TEC LLC | GRANT |
| Clayton Industries | GRANT |
| Foster Wheeler LLC | GRANT |
| Gardner Denver Inc. | GRANT |
| General Electric Company | GRANT |
| Genuine Parts Company | GRANT |
| Mack Trucks Inc. | GRANT |
| Marotta Controls Inc. | GRANT |
| National Automotive Parts Assoc. | GRANT |
| Navistar Inc. | GRANT |
| Neles-Jamesbury Inc. | GRANT |

## II.    BACKGROUND

### A.  Procedural History

Plaintiff filed this personal injury action against multiple defendants on March 15, 2016,

in the Superior Court of Delaware, asserting claims arising from his alleged harmful exposure to

asbestos.  (D.I. 1, Ex. 1)  On April 27, 2016, the case was removed to this court by Defendant

Crane Co. pursuant to 28 U.S.C. §§ 1442(a)(1), the federal officer removal statue,[3] and 1446.

(D.I. 1)  Plaintiff filed a First Amended Complaint on September 12, 2016.  (D.I. 49)

BorgWarner, Clayton, Foster Wheeler, Gardner, GE, GPC, Mack Trucks, Marotta, NAPA,

Navistar, and Neles-Jamesbury filed the pending motions for summary judgment, individually.

(D.I. 140, 163, 158, 142, 160, 145, 151, 192, 153, 144)  Plaintiff did not respond to these

motions.

### B.  Facts

---

[3] The federal officer removal statute permits removal of a state court action to federal court
when, *inter alia*, such action is brought against "[t]he United States or an agency thereof or any
officer (or any person acting under that officer) of the United States or of any agency thereof,
sued in an official or individual capacity for any act under color of such office." 28 U.S.C. §
1442(a)(1).

## 1. Plaintiff's alleged exposure history

Plaintiff alleges he developed asbestosis and asbestos related pleural disease as a result of exposure to asbestos-containing materials during his service in the Navy, as well as from his civilian work with automobiles. (D.I. 49 at ¶¶ 4, 11, 15) Plaintiff contends he was injured due to exposure to Defendants' asbestos-containing products. (*Id.* at ¶ 13) Accordingly, Plaintiff asserts claims for negligence, willful and wanton conduct, strict liability, conspiracy, and punitive damages. (*Id.* at 11-27)

Plaintiff was deposed on January 31 and February 1, 2017. (D.I. 98) Plaintiff did not produce any other fact or product identification witnesses for deposition.[4] First, Plaintiff alleges he experienced secondary exposure to asbestos from living in his family home from 1946-1958 with his father, who owned and operated Hickman's Service Station. (D.I. 49 at ¶¶ 15, 16) He testified that his father performed brake work on trucks and cars and would use an air hose, which created dust. (D.I. 179, Ex. A at 217:5-10; 222:2-22) His father would return home in his uniform, where Plaintiff would "sometimes" hug his father, whose clothes "could have" remained dusty from vehicle servicing work. (*Id.* at 219: 2-17)

Plaintiff first enlisted in the Navy in 1963. (D.I. 49 at ¶ 11) He attended basic training in San Diego for four months before traveling to Hawaii in January of 1964. (D.I. 149, Ex. A at 52:13-23) Plaintiff spent roughly "eighteen months" in Hawaii, where he was assigned to the USS Nicholas (the "Nicholas"). (*Id.* at 52:19-24; 75:24-76:5) Aboard the Nicholas, he worked in the engine and boiler rooms as a fireman apprentice and, later, as a fireman. (*Id.* at 76:6-77:7, 77:21-78:8) He worked primarily as an operator, and also performed maintenance clean-up duties. (*Id.* at 78:9-19) Plaintiff testified that he removed asbestos insulation from a generator,

---

[4] The deadline for completion of depositions of all co-worker, product identification, and other exposure testimony witnesses was March 21, 2017. (D.I. 64 at 3-4)

3

which he believes was either General Electric or Westinghouse, and certain service pumps. (*Id.* at 84:5-85:5; 87:14-88:6) He could not describe the pumps other than that they pumped water or oil. (*Id.* at 174:18-176:9)

Plaintiff went to the Great Lakes Naval Facility ("Great Lakes") for four months where he received a military rating of engineman. (*Id.* at 53:1-8; 54:1-2) At Great Lakes he lived in the barracks, and is not aware of asbestos exposure while there. (*Id.* at 53:13-21; 89:24-90:3) In approximately 1965, Plaintiff joined the USS Impervious (the "Impervious") in Long Beach, California as an engineman fireman third class, and became second class after a year. (*Id.* at 54:3-22; 91:7-10) After making second class, his work became more supervisory in nature and he did less hands-on repair work. (*Id.* at 95:5-16) Plaintiff repaired diesel engines, pumps, valves, boilers, and air conditioning equipment. (*Id.* at 91:11-16) He believes he was exposed to asbestos from the asbestos padding or "blankets" on the diesel engines, but does not know who made these products. (*Id.* at 92:19-93:5) Plaintiff also testified there was asbestos wrapped piping in the living quarters, but he does not know the manufacturer of this product. (*Id.* at 93:9-18)

Plaintiff then served aboard the USS Endurance (the "Endurance"), where he was a second class engineman with similar duties to the Impervious. (*Id.* at 94:15-23; 96:5-14) He believes he was exposed to asbestos from the boilers, as well as from removing insulation pads/lagging. (*Id.* at 97:16-22; 98:13-17)

In 1968, Plaintiff reported to Norfolk, Virginia for two months where he does not believe he was exposed to asbestos. (*Id.* at 99:3-23)

He transferred to Annapolis, Maryland, where he worked on training boats, including yard patrol boats, work boats, utility boats, and sailboats, from 1968 to 1970. (*Id.* at 56:14-21;

57:4-12; 99:24-101:17) He believes he was exposed to asbestos-containing material from lagging/pads on the engines and pipe insulation, but does not know the manufacturer of this material. (*Id.* at 101:18-102:18; 103:15-23)

Sometime in late 1970, Plaintiff arrived in Vallejo, California, where he became an engineman first class and trained for three months for Vietnam. (*Id.* at 57:19-58:14) While in Vietnam in early 1971, he patrolled the boats and identified more padding insulation affixed to piping and exhausts. (*Id.* at 58:13-14; 110:13-23; 111:7-24; 112:1-12) Plaintiff lived on a barge in Vietnam where there was pipe insulation, but he does not know who manufactured these materials. (*Id.* at 111:7-112:12) He estimates he returned from Vietnam in November 1971. (*Id.* at 59:12-14; 109:16-19)

Plaintiff returned to Delaware for approximately one month in early 1972 before the Navy transferred him to Norfolk, Virginia to work on submarines. (*Id.* at 60:3-12) Plaintiff was assigned to the USS L.Y. Spear (the "L.Y. Spear") for four years, and lived aboard the ship during the last eighteen months of his assignment. (*Id.* at 60:3-12; 60:17-24; 113:4-16; 118:12-14) He did not work in the engine room of the L.Y. Spear, nor did he perform maintenance or repair on the ship. (*Id.* at 114:9-17) Instead, his work took him aboard other ships and he recalled five of the eight submarines he performed work on: the Skipjack, Lapon, Bluefish, Spadefish, and Shark. (D.I. 193, Ex. A at 115:2-23; Ex. B at 367:11-22) Plaintiff removed some service pumps from these submarines but he does not know who manufactured the pumps. (*Id.* at 115:24-117:5) He testified that there was insulation/lagging and pads affixed to the piping leading to the service pumps, but he does not know who manufactured the lagging or pads. (*Id.* at 117:10-118:2)

While still assigned to the L.Y. Spear, Plaintiff accepted part-time employment with

5

North Ship Co. for six months in 1974. (*Id.* at 118:15-22) He was an outside machinist who removed pumps and valves from gas oil tankers. (*Id.* at 120:1-14)

In 1975, the Navy transferred Plaintiff to Philadelphia, Pennsylvania for three years. (*Id.* at 61:22-62:12; 125:19-126:4) In Philadelphia, he removed valves and pumps from decommissioned ships, which were then reused aboard active vessels. (*Id.* at 127:10-129:11; 130:2-11; 131:22-132:15) Some of the ships he went aboard include the USS Iowa, the USS Wisconsin, the USS Intrepid, the USS Keasarge, the USS Northampton, the USS Salem, and "a few smaller ships." (*Id.* at 130:7-131:17) Plaintiff associates asbestos exposure in Philadelphia with removing lagging or asbestos material from the pumps and valves, though he does not know who manufactured these materials. (*Id.* at 133:16-134:4; 134:16-21)

In 1977, Plaintiff went overseas to Bahrain on the USS Lasalle (the "Lasalle") and spent a year aboard the ship. (*Id.* at 62:21-63:6) He worked as a Chief Petty Officer in charge of the maintenance department that included twenty-five to thirty men. (*Id.* at 138:2-24) Plaintiff testified that there was asbestos-containing material on board, including lagging that covered the piping. (*Id.* at 140:11-141:4)

Plaintiff was then stationed aboard the USS Opportune in Little Creek, Virginia, for approximately one year while also working at the naval station. (*Id.* at 63:9-64:8) His title at this time was assistant engineer, and he supervised maintenance and the operation of the engineering department. (*Id.* at 143:2-143:18) Plaintiff identified lagging and pads as the only asbestos-containing materials. (*Id.* at 145:9-16) The insulating materials were affixed to the piping, valves, and the exhaust system on the diesel engines. (*Id.* at 144:4-10; 145:9-16)

From 1980 to 1983, Plaintiff was assigned to the naval station at Little Creek, where he was in charge of maintenance in the engine overhaul shop. (*Id.* at 147:6-12) He identified the

6

padding around the exhaust as an asbestos-containing product. (*Id.* at 147:13-18)

Plaintiff left the Navy for two years and then reenlisted in 1985. (*Id.* at 66:19-22) He spent the first eighteen months between school in Norfolk and at Great Lakes. (*Id.* at 66:10-68:7) Subsequently, he reported to Sturgeon Bay, Wisconsin for the new construction of a ship. (*Id.* at 68:8-16) Once the ship was built, Plaintiff returned to Norfolk and finished his career with the Navy.

During his deposition, Plaintiff also discussed his civilian automotive work. During the summers and weekends from 1961 to 1963, Plaintiff worked for Hitchens' Chevron. (D.I. 162, Ex. B at 73:21-22; 187:2-6) He spent half his time pumping gas, and also performed oil changes or "lube jobs," assisted customers in the convenience store, and assisted his uncle with brake work. (*Id.* at 187:11-189:9) He would clean up the dust after his uncle finished removing and replacing brakes. (*Id.* at 189:3-9) While in the Navy and stationed in Norfolk in 1970, Plaintiff pumped gas part time at Wayson's Exxon for "two or three" seasons. (*Id.* at 107:23-108:3) He did not personally perform any brake work, but was around when mechanics performed such jobs. (*Id.* at 107:18-22)

Plaintiff testified about personal automotive repairs he performed on about five vehicles: a 1970 Mustang, a 1967 Chevelle, a 1977 Chevrolet, a 1973 Chevrolet, and two Buicks. (D.I. 147, Ex. D at 155:11-156:11) Some of these repairs included rebuilding the engine, changing the exhaust, replacing the valve covers, and working on the brakes. (D.I. 162, Ex. B at 196:5-14) Plaintiff did not recall the brand name or manufacturer of any of the replacement parts he used. (D.I. 147, Ex. D at 157:21-159:7)

### 2. Plaintiff's product identification evidence

Plaintiff is the sole product identification witness in this case and his deposition occurred

7

on January 31 and February 1, 2017. (D.I. 98)

### a. BorgWarner Morse TEC LLC

Plaintiff did not identify an asbestos-containing BorgWarner product.

### b. Clayton Industries

Plaintiff testified that he "think[s]" he worked on Clayton boilers during his time on the Endurance and the Impervious. (D.I. 167, Ex. 1 at 98:9-12) Plaintiff testified that the Endurance and Impervious were "identical sister ships," and maintenance on both ships was the same. (*Id.* at 96:15-23) Plaintiff believes he was exposed to asbestos while working on these alleged Clayton boilers by removing alleged asbestos lagging and gaskets while performing maintenance on the boilers. (*Id.* at 210:9-20) Plaintiff cleaned and performed the general maintenance and upkeep of the alleged Clayton boilers. (*Id.* at 203:8-18) He testified that these Clayton boilers were "fire tube boilers," and he cleaned the tubes. (*Id.* at 203:16-24) Plaintiff testified that there were two Clayton boilers on the Endurance, and he worked on both of them. (*Id.* at 203:22-204:5)

### c. Foster Wheeler LLC

Plaintiff did not initially identify a Foster Wheeler product. He answered affirmatively, though, when his counsel asked if he recalled working with a Foster Wheeler boiler. (D.I. 159, Ex. A at 225:22-226:3) Plaintiff stated that he cannot remember what ship any Foster Wheeler boiler was on, but that it was "probably at the Philadelphia inactive ships." (*Id.* at 226:2-21) Plaintiff could not recall what work he did to a Foster Wheeler boiler. (*Id.* at 226:2-17)

### d. Gardner Denver Inc.

Plaintiff testified that he recalled seeing Gardener portable compressors on the LaSalle and in the Philadelphia and Norfolk shipyards. (D.I. 142, Ex. B at 346:1-347:1) He stated that

he knew this was a Gardner compressor "because of the label on it." (*Id.* at 348:14-16) Plaintiff was unable to provide a description of these compressors. (*Id.* at 343:23-345345:11) Plaintiff did not perform internal work on these compressors and was not present when others performed any internal work on these compressors. (*Id.* at 347:15-348:9; 348:20-23) Plaintiff testified that these compressors were made of steel, and he did not know whether any of the compressors contained asbestos. (*Id.* at 347:21-348:1; 348:10-13)

### e. General Electric Company

Plaintiff testified that, while aboard the Nicholas, he removed asbestos insulation from generators and turbines, which may have been manufactured by GE. (D.I. 161, Ex. A at 84:10-85:13; 239:5-7) Plaintiff testified that he performed repair work to the generator and turbine, but did not perform any reinsulating work. (*Id.* at 174:1-12) Plaintiff testified that while working for North Ship Co. on both Navy and private vessels, he removed turbine casings. (*Id.* at 121:13-122:3) However, Plaintiff could not identify the manufacturer of any specific turbine or ship aboard which it would be found. (*Id.* at 124:3-21) While aboard the LaSalle, Plaintiff believed there to be a GE turbine, but he testified that he did no maintenance work on that turbine. (*Id.*, Ex. B at 259:4-260:14; 262:6-18) Finally, Plaintiff recalled working on GE reduction gear, but could not recall with which ships he would associate this work. (*Id.*, Ex. A at 239:21-240:6) He stated that the source of his alleged exposure was only to the insulating material surrounding the flanges leading to the gears and not the gears themselves. (*Id.* at 240:7-11)

### f. Genuine Parts Company

GPC is a distributor and/or assembler of replacement automobile parts. (D.I. 147 at 6) GPC's remanufacturing, assembly, and/or distribution of automotive products occur through GPC's unincorporated Rayloc division. (*Id.* at 6-7) Many stores operated by GPC have

subsequently been resold to "independent jobbers." (*Id.* at 7) Plaintiff did not identify an asbestos-containing product remanufactured or supplied by GPC. (*See id.*, Ex. D)

### g. Mack Trucks Inc.

Plaintiff did not maintain, repair, or service a Mack truck. (D.I. 152, Ex. A at 320:15-19; 323:19-21) Plaintiff testified that on four occasions in the 1950s, he was present when his father serviced a Mack truck at Hickman's Service Station. (*Id.* at 321:22-331:23; 332:14-18) He recalled that two of these occasion involved replacement of rear brakes and other brake work. (*Id.* at 321:22-322:20; 325:25-326:5; 328:15-329:17; 329:23-330:19)

### h. Marotta Controls Inc.

Plaintiff testified that he encountered Marotta valves on submarines he maintained while serving on the L.Y. Spear between 1972 and 1975. (D.I. 193, Ex. A at 230:19-22; Ex. B at 363:24-364:15; 365:3-14) These submarines included the Skipjack, Lapon, Bluefish, Spadefish, and Shark. (*Id.*, Ex. A at 115:2-23; Ex. B at 367:11-22) Plaintiff did not perform maintenance on the L.Y. Spear itself, but rather maintained submarines while they were at port in Norfolk and aboard the L.Y. Spear. (*Id.*, Ex. A at 114:15-17; Ex. B at 368:7-11) Plaintiff identified these valves as high pressure air valves. (*Id.*, Ex. A at 230:12-18; Ex. B at 365:4-7) He described these Marotta valves as approximately ten inches in length and six inches in diameter. (*Id.*, Ex. B at 373:4-11) The valves were brass with metal components ranging in size of five inches to a "butterfly" piece, which was "smaller than a pinkie fingernail." (*Id.* at 369:9-13; 372:8-19; 373:15-18) Plaintiff testified that he did three different tasks on the valves: removal, overhaul, and replacement. (*Id.* at 366:20-367:1)

### i. National Automotive Parts Assoc.

NAPA is a not-for-profit membership corporation that functions as a trade association for

10

various distributors in the replacement automotive parts business. (D.I. 147 at 6) It has no

subsidiaries, "predecessor" corporations, or sales offices. (*Id.*) NAPA does not manufacture,

distribute, or sell any automotive parts. (*Id.*) Plaintiff testified that he performed personal

automotive repairs on about five vehicles: a 1970 Mustang, a 1967 Chevelle, a 1977 Chevrolet, a

1973 Chevrolet, and two Buicks. (*Id.*, Ex. D at 155:11-156:11) When asked where he purchased

the replacement parts, Plaintiff testified that he purchased parts from "regular automotive

jobbers…[s]ome in Pennsylvania, some in Delaware, and some in Virginia." (*Id.* at 158:17-23)

Plaintiff further stated that the auto parts stores were "[l]ike NAPA and just any – any auto parts

place." (*Id.*) He testified that he did not recall purchasing parts for the 1970 Mustang at

"NAPA," but that "NAPA" is just a name of an auto parts store that he could think of. (*Id.* at

158:24-159:7)

### j. Navistar Inc.

The only testimony Plaintiff offered in regard to Navistar is that he may have been

present when his father performed work on an International truck at Hickman's Service Station

in the 1950s. (D.I. 166, Ex. A at 220:2-17; 291:6-12) Plaintiff stated that his father replaced the

brakes on an International truck more than once but less than five times. (*Id.* at 304:12-16)

### k. Neles-Jamesbury Inc.

Plaintiff did not initially identify a Neles-Jamesbury product. He answered affirmatively,

though, when his counsel asked if he recalled using a Neles-Jamesbury valve. (D.I. 146, Ex. B at

229:11-14) Plaintiff could not recall where he used a Neles-Jamesbury valve, but stated that it

was on "one of those seven ships." (*Id.* at 229:16-18) He did not know the type, size, or color of

any valves manufactured by Neles-Jamesbury that he may have encountered. (*Id.*, Ex. C at

380:7-22) He did not specifically recall performing any work on valves manufactured by Neles-

Jamesbury, and could not say whether Neles-Jamesbury valves contained asbestos. (*Id.* at 383:4-23)

## III.   LEGAL STANDARDS

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex*, 477 U.S. at 321. The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial, and the court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989); *Scott v. Harris*, 550 U.S. 372, 380 (2007). The non-movant must support its contention by citing to particular documents in the record, by showing that the cited materials do not establish the absence or presence of a genuine dispute, or by showing that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)–(B). The existence of some alleged factual dispute may not be sufficient to deny a motion for summary judgment; rather, there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue. *See Anderson*, 477 U.S. at 247–49. "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Clark v. Welch*, 2016 WL 859259, at *2 (D. Del. Mar. 3, 2016). If the non-movant fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, then the movant is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

If a party fails to address another party's assertion of fact, the court may consider the fact undisputed, or grant summary judgment if the facts show that the movant is entitled to it. Fed. R. Civ. P. 56(e)(2)–(3).[5] A plaintiff's failure to respond "is not alone a sufficient basis for the entry of a summary judgment." *Anchorage Assocs. v. Virgin Islands Bd. Of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). Even where a party does not file a responsive submission to oppose the motion, the court must still find that the undisputed facts warrant judgment as a matter of law. *Miller v. Ashcroft*, 76 F. App'x 457, 462 (3d Cir. 2003) (citing Fed. R. Civ. P. 56; *Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993)). In other words, the court must still determine whether the unopposed motion for summary judgment "has been properly made and supported."

---

[5] This section was added to Rule 56 to overcome cases in the Third Circuit that impaired the utility of the summary judgment device:

> A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matters sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue.

Fed. R. Civ. P. 56(e) advisory committee's note. Before the amendment, the Third Circuit would have denied summary judgment if the averments were "well-pleaded," and not conclusory. *Id.* However, the Advisory Committee noted that summary judgment is meant to pierce the pleadings and to assess proof to see whether there is a genuine need for trial. *Id.* Accordingly, the pre-amendment Third Circuit precedent was incompatible with the basic purpose of the rule. *Id.* The amendment recognizes that, "despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The amendment, however, was not designed to affect the ordinary standard applicable to summary judgment. *Id.*

*Williams v. Murray, Inc.*, 2014 WL 3783878, \*2 (D.N.J. July 31, 2014) (quoting *Muskett v.*
*Certegy Check Svcs., Inc.*, 2010 WL 2710555, at \*3 (D.N.J. July 6, 2010)).

### B. Maritime Law

The parties do not dispute that maritime law applies to all Naval/sea-based claims.[6] (D.I.
129) In order to establish causation in an asbestos claim under maritime law, a plaintiff must
show, for each defendant, that "(1) he was exposed to the defendant's product, and (2) the
product was a substantial factor[7] in causing the injury he suffered." *Lindstrom v. A-C Prod.*
*Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Stark v. Armstrong World Indus., Inc.*, 21
F. Appx. 371, 375 (6th Cir. 2001)); *Dumas v. ABB Grp., Inc.*, 2015 WL 5766460, at \*8 (D. Del.
Sept. 30, 2015), *report and recommendation adopted*, 2016 WL 310724 (D. Del. Jan. 26, 2016);
*Mitchell v. Atwood & Morrill Co.*, 2016 WL 4522172, at \*3 (D. Del. Aug. 29, 2016), *report and*
*recommendation adopted*, 2016 WL 5122668 (D. Del. Sept. 19, 2016); *Denbow v. Air & Liquid*
*Sys. Corp.*, 2017 WL 1199732, at \*4 (D. Del. Mar. 30, 2017), *report and recommendation*

---

[6] For maritime law to apply, a plaintiff's exposure underlying a products liability claim must
meet both a locality test and a connection test. In *Jerome B. Grubart v. Great Lakes Dredge &*
*Dock Co.*, 513 U.S. 527 (1995), the Supreme Court defined these tests as follows:

> A court applying the location test must determine whether the tort occurred on
> navigable water or whether injury suffered on land was caused by a vessel on
> navigable water. The connection test raises two issues. A court, first, must "assess
> the general features of the type of incident involved," to determine whether the
> incident has "a potentially disruptive impact on maritime commerce[.]" Second, a
> court must determine whether "the general character" of the "activity giving rise
> to the incident" shows a "substantial relationship to traditional maritime activity."

513 U.S. at 534 (internal citations omitted).

[7] "Maritime law incorporates traditional 'substantial factor' causation principles, and courts often
look to the Restatement (Second) of Torts for a more helpful definition." *Delatte v. A.W.*
*Chesterton Co.*, 2011 WL 11439126, at \*1 n.1 (E.D. Pa. Feb. 28, 2011). The comments to the
Restatement indicate that the word "substantial," in this context, "denote[s] the fact that the
defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard
it as a cause, using that word in the popular sense, in which there always lurks the idea of
responsibility." Restatement (Second) of Torts § 431 cmt. a (1965).

*adopted*, 2017 WL 1427247 (D. Del. Apr. 19, 2017). Other courts in this Circuit recognize a third element and require a plaintiff to "show that (3) the defendant manufactured or distributed the asbestos-containing product to which exposure is alleged."[8] *Abbay v. Armstrong Int'l, Inc.*, 2012 WL 975837, at *1 n.1 (E.D. Pa. Feb. 29, 2012).

"In establishing causation, a plaintiff may rely upon direct evidence (such as testimony of the plaintiff or decedent who experienced the exposure, co-worker testimony, or eye-witness testimony) or circumstantial evidence that will support an inference that there was exposure to the defendant's product for some length of time."[9] *Abbay*, 2012 WL 975837, at *1 n.1 (citing *Stark*, 21 F. Appx. at 376).

On the other hand, "'[m]inimal exposure' to a defendant's product is insufficient to establish causation. Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Lindstrom*, 424 F.3d at 492 (quoting *Stark*, 21 F. Appx. at 376). "Rather, the plaintiff must show 'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Abbay*, 2012 WL 975837, at *1 n.1 (quoting *Lindstrom*, 424 F.3d at 492). "Total failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict product[] liability." *Stark*, 21 F. Appx. at 376 (citations omitted).

## C. Delaware Law

---

[8] The majority of federal courts have held that, under maritime law, a manufacturer has no liability for harms caused by, and no duty to warn about hazards associated with, a product it did not manufacture or distribute. This is also referred to as the "bare metal" defense. *See Dalton v. 3M Co.*, 2013 WL 4886658, at *7 (D. Del. Sept. 12, 2013) (citing cases); *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012).

[9] However, "'substantial exposure is necessary to draw an inference from circumstantial evidence that the exposure was a substantial factor in causing the injury.'" *Stark*, 21 F. Appx. at 376 (quoting *Harbour v. Armstrong World Indus., Inc.*, 1991 WL 65201, at *4 (6th Cir. April 25, 1991)).

15

The parties do not dispute that Delaware law applies to all land based claims. (D.I. 129)

Under Delaware law, a plaintiff asserting a claim for asbestos-related injuries must introduce

evidence showing a product nexus between defendant's product and plaintiff's asbestos-related

injuries. *Cain v. Green Tweed & Co.*, 832 A.2d 737, 741 (Del. 2003) (citing *In re Asbestos*

*Litig.*, 509 A.2d 1116, 1117 (Del. Super. Ct. 1986), *aff'd sub nom. Nicolet, Inc. v. Nutt*, 525 A.2d

146 (Del. 1987)).

Delaware courts have not followed the "frequency, proximity, and regularity" test,[10] first

set forth in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), which has

been adopted as the test in numerous jurisdictions. *Happel v. Anchor Packing Co.*, 2010 WL

7699063, at *1 (E.D. Pa. Oct. 14, 2010). Delaware courts simply require a plaintiff show that he

was in proximity to the product at the time it was being used. *Nutt v. A .C. & S. Co.,* 517 A.2d

690 (Del. Super. Ct. 1986). Plaintiff must show "that the asbestos product was used in an area

where the plaintiff frequented, walked by, or worked adjacent to, with the result that fibers

emanating from the use of the product would have been present in the area where the plaintiff

worked." *Cain*, 832 A.2d at 741. "Implicit within this product nexus standard is the requirement

that the particular defendant's product to which the plaintiff alleges exposure must be susceptible

to releasing fibers which are capable of ingestion or respiration into the plaintiff's body." *In re*

*Asbestos Litig.*, 2007 WL 1651968, at *19 (Del. Super. Ct. May 31, 2007), *as corrected* (June

25, 2007) (*quoting Merganthaler v. Asbestos Corp. of America,* 1988 WL 116405 at *1–2 (Del.

Super. Ct. 1988)).

---

[10] The court, in *Lohrmann*, stated that to support a reasonable inference of substantial causation
from circumstantial evidence, there must be evidence of exposure to a specific product on a
regular basis over some extended period of time in proximity to where the plaintiff actually
worked. *Lohrmann*, 782 F.2d at 1162–63. The test for substantial factor causation found in
*Lindstrom* appears to be consistent with this "frequency, regularity, proximity" test.

This standard, known as the "product nexus standard," is meant to ensure that the plaintiff presents "a factual connection in space and time between a particular plaintiff and a particular defendant's product." *Id.* Delaware courts have held that a plaintiff can survive summary judgment if there is testimony that asbestos-containing products were used at a worksite during the time plaintiff was employed there. *Happel*, 2010 WL 7699063, at *1. However, it is insufficient to overcome summary judgment if the "time and place" testimony is based on speculation or conjecture. *Id.* (citing *In re: Asbestos Litigation,* 509 A.2d at 1117–18).

## IV. DICUSSION

### A. BorgWarner Morse TEC LLC

The court recommends granting BorgWarner's motion for summary judgment, because there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing BorgWarner product. During Plaintiff's deposition, he did not identify any BorgWarner product. Because Plaintiff has not introduced evidence showing a product nexus between BorgWarner's products and his asbestos-related injuries, as required by Delaware law, BorgWarner's motion for summary judgment should be granted.

### B. Clayton Industries

The court recommends granting Clayton's motion for summary judgment. Although Plaintiff testified that he "think[s]" he worked on Clayton boilers during his time on the Endurance and Impervious, there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing product made by Clayton. (D.I. 167, Ex. 1 at 98:9-12) Plaintiff testified that he was exposed to asbestos while working on these alleged Clayton boilers by removing alleged asbestos lagging and gaskets while performing maintenance on the boilers, but he could not identify the manufacturer of the lagging or gaskets that he

removed or replaced. (*Id.* at 92:19-93:5; 97:19-98:8; 210:9-211:19) Moreover, Plaintiff testified that the alleged Clayton boilers he worked on were "fire tube boilers." (*Id.* at 203:16-24) However, Clayton has never made a fire tube boiler and instead manufactured boilers with a water tube system. (*Id.*, Ex. 2 at ¶¶ 3-4)

Plaintiff's deposition testimony fails to create a material issue of fact as to whether Clayton's products were a substantial contributing factor to his injuries. *See Lindstrom*, 424 F.3d at 492. Therefore, the court recommends granting Clayton's motion for summary judgment.

### C. Foster Wheeler LLC

The court recommends granting Foster Wheeler's motion for summary judgment, because there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing product made by Foster Wheeler. Foster Wheeler avers that Plaintiff did not identify working with or around any original asbestos-containing materials that were made or supplied by Foster Wheeler. (D.I. 159 at 7) Additionally, Foster Wheeler raises the bare metal defense. (*Id.* at 10-14) It contends that it is not responsible for any asbestos-containing products manufactured by other parties.

Although Plaintiff answered affirmatively when asked by counsel if he recalled working with a Foster Wheeler boiler, he failed to rebut the assertion that any Foster Wheeler boiler at issue did not contain asbestos. (*Id.*, Ex. A at 225:22-226:3) Furthermore, Plaintiff could not remember any specifics regarding his exposure to Foster Wheeler Boilers. (*Id.*, Ex. B at 255:1-259:3) Finally, the bare metal defense precludes holding Foster Wheeler responsible for asbestos-containing products that Foster Wheeler did not manufacture, sell, or distribute that were applied to Foster Wheeler boilers. *See Dalton*, 2013 WL 4886658, at *6-7. Consequently, there is insufficient evidence to maintain the causal nexus required by maritime law, and

18

summary judgment should be granted in Foster Wheeler's favor.

### D. Gardner Denver Inc.

The court recommends granting Gardner's motion for summary judgment. Although Plaintiff testified that he recalled seeing Gardner portable compressors on the LaSalle and in the Philadelphia and Norfolk shipyards, he did not offer sufficient testimony to create a dispute of fact to whether any Gardner compressor contained asbestos to which he was exposed. (D.I. 142, Ex. B at 346:1-347:1) Plaintiff did not perform internal work on these compressors and was not present when others performed any internal work on these compressors. (*Id.* at 347:15-348:9; 348:20-23) Plaintiff testified that these compressors were made of steel and he did not know whether any of the compressors contained asbestos. (*Id.* at 347:21-348:1; 348:10-13) Plaintiff's testimony fails to prove that Gardner's products were a substantial contributing factor to his injury under maritime law. *See Lindstrom*, 424 F.3d at 492.

Additionally, Gardner raises the bare metal defense, which precludes holding Gardner responsible for asbestos-containing products that Gardner did not manufacture, sell, or distribute that were applied to Gardner compressors. (D.I. 143 at 11-13); *See Dalton*, 2013 WL 4886658, at *6–7. As such, the court recommends granting Gardner's motion for summary judgment.

### E. General Electric Company

The court recommends granting GE's motion for summary judgment. Although Plaintiff testified that he may have encountered GE products aboard the Nicholas, the LaSalle, and while employed by North Ship Co., he did not offer sufficient testimony to create a dispute of fact to whether he was exposed to asbestos-containing GE products. (D.I. 161, Ex. A at 84:10-85:13; 121:13-122:3; 239:5-7; 239:21-240:6; Ex. B at 259:4-260:14; 262:6-18) Plaintiff could not specifically identify these products as manufactured by GE. Plaintiff's testimony fails to prove

19

that GE's products were a substantial contributing factor to his injury under maritime law. *See Lindstrom*, 424 F.3d at 492.

Additionally, GE raises the bare metal defense, which precludes holding GE responsible for asbestos-containing products that GE did not manufacture, sell, or distribute that were applied to GE equipment. (D.I. 161 at 10-15); *See Dalton*, 2013 WL 4886658, at *6–7. As such, the court recommends granting GE's motion for summary judgment.

### F. Genuine Parts Company

The court recommends granting GPC's motion for summary judgment, because there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing product made by GPC. During Plaintiff's deposition, he did not identify an asbestos-containing product remanufactured or supplied by GPC. As required under Delaware law, Plaintiff has not shown a factual connection in space and time between him and a product manufactured or supplied by GPC. *In re Asbestos Litig.*, 2007 WL 1651968, at *19. Because Plaintiff has not introduced evidence showing a product nexus between GPC's products and his asbestos-related injuries, GPC's motion for summary judgment should be granted.

### G. Mack Trucks Inc.

The court recommends granting Mack Truck's motion for summary judgment, because there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing Mack Truck product. Plaintiff did not maintain, repair, or service a Mack truck. (D.I. 152, Ex. A at 320:15-19; 323:19-21) Plaintiff testified that on four occasions in the 1950s, he was present when his father performed brake work on a Mack truck at the Hickman's Service Station. (*Id.* at 321:22-331:23; 332:14-18) However, Plaintiff did not know who manufactured or supplied the brakes removed or installed. (*Id.* at 324:12-19; 326:25-328:9) He

also did not know the maintenance history, year of manufacture, or mileage of any of these alleged Mack trucks. (*Id.* at 324:4-6; 327:18-23; 331:7-12) As required under Delaware law, Plaintiff has not shown a factual connection in space and time between him and a Mack Truck product. *In re Asbestos Litig.*, 2007 WL 1651968, at *19. Because Plaintiff has not introduced evidence showing a product nexus between Mack Truck's products and his asbestos-related injuries, Mack Truck's motion for summary judgment should be granted.

### H. Marotta Controls Inc.

The court recommends granting Marotta's motion for summary judgment, because there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing product made by Marotta. Marotta avers that Plaintiff did not identify working with or around any original asbestos-containing materials that were made or supplied by Marotta. (D.I. 193 at 5-6) Additionally, Marotta raises the bare metal defense. (D.I. 193 at 16-17) Marotta contends that it is not responsible for any asbestos-containing products manufactured by other parties.

Although Plaintiff answered affirmatively when asked by counsel if he recalled working with Marotta valves, he failed to rebut the assertion that any Marotta valve at issue did not contain asbestos. (*Id.*, Ex. A at 230:12-22) Plaintiff testified that all pieces of the valves were metal or "O-rings," which are pure synthetic rubber. (*Id.*, Ex. B at 369:14-16; 373:19-24; Ex. H at ¶ 21) Plaintiff testified that the valves themselves did not contain any asbestos. (*Id.*, Ex. B at 370:3-8)

Furthermore, Plaintiff's only alleged asbestos exposure during removal and overhaul work occurred form the removal of external insulation or lagging on the pipes leading to the valves. (*Id.* at 369:17-370:2; 371:17-20) He did not know the manufacturer of any of the

padding, lagging, or insulation removed or installed on or around the valves. (*Id.* at 363:4-14)
As such, the bare metal defense precludes holding Marotta responsible for asbestos-containing
products that Marotta did not manufacture, sell, or distribute that were applied to Marotta valves.
*See Dalton*, 2013 WL 4886658, at *6–7. Consequently, there is insufficient evidence to maintain
the causal nexus required by maritime law, and summary judgment should be granted in
Marotta's favor.

### I.  National Automotive Parts Assoc.

The court recommends granting NAPA's motion for summary judgment, because there is
no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-
containing product made by NAPA. Plaintiff testified that he purchased replacement parts for
his personal automobiles from "regular automotive jobbers...[s]ome in Pennsylvania, some in
Delaware, and some in Virginia." (D.I. 147, Ex. D at 158:17-23) He testified that the auto parts
stores were "[l]ike NAPA and just any – any auto parts place." (*Id.*) He did not recall
purchasing parts for the 1970 Mustang at "NAPA," but that "NAPA" is just a name of an auto
parts store that he could think of. (*Id.* at 158:24-159:7) This testimony appears only to describe,
rather than identify, the type of automotive parts store from which Plaintiff may have purchased
replacement automobile parts. Even assuming Plaintiff did purchase automotive parts from a
NAPA store, this does not show a product nexus as required by Delaware law. It is insufficient
to overcome summary judgment if the "time and place" testimony is based on speculation or
conjecture. *Happel*, 2010 WL 7699063, at *1. Consequently, NAPA's motion for summary
judgment should be granted.

### J.  Navistar Inc.

The court recommends granting Navistar's motion for summary judgment, because there

is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing Navistar product. Plaintiff testified that he may have been present when his father performed work on an International truck at Hickman's service station in the 1950s. (D.I. 166, Ex. A at 220:2-17; 291:6-12) Plaintiff stated that his father replaced the brakes on an International truck more than once but less than five times. (*Id.* at 304:12-16) Plaintiff did not know the model or year of the International truck his father allegedly worked on, nor did he know its maintenance history. (*Id.* at 300:14-17; 302:8-20) Even assuming Plaintiff was present when his father performed work on an International truck, this does not show a product nexus as required by Delaware law. It is insufficient to overcome summary judgment if the "time and place" testimony is based on speculation or conjecture. *Happel*, 2010 WL 7699063, at *1. Consequently, Navistar's motion for summary judgment should be granted.

### K. Neles-Jamesbury Inc.

The court recommends granting Neles-Jamebury's motion for summary judgment. Plaintiff alleges he was exposed to asbestos through removing and replacing asbestos padding, interference lagging, and insulation from various machinery, including valves, as well as from the flange or packing associated with a valve. (D.I. 146, Ex. B at 121:17-122:3; 122"18-123:13; 133:16-134:4; 140:18-21; 145:9-16; 166:1-167:15; 230:6-10; Ex. C at 279:14-22)

Although Plaintiff testified that he recalled using Neles-Jamesbury valves, there is no genuine issue of material fact in dispute as to whether Plaintiff was exposed to an asbestos-containing product made by Neles-Jamesbury. (*Id.*, Ex. B at 229:11-14) Plaintiff could not recall where he used a Neles-Jamesbury valve, and he did not know the type, size, or color of any Neles-Jamesbury valve he may have encountered. (*Id.*, 229:16-18; Ex. C at 380:7-22) He did not specifically recall performing any work on valves manufactured by Neles-Jamesbury,

23

and could not say whether Neles-Jamesbury valves contained asbestos. (*Id.*, Ex. C at 383:4-23) Moreover, Plaintiff did not know the maintenance history of any of the valves he encountered while serving in the Navy. (*Id.*, Ex. B at 88L23-89:2; 94:11-14; 103:8-11; 122:14-17; 133:9-15; 142:3-11; 146:21-24; Ex. C at 280:5-18; 362:21-25; 392:25-393:11) Plaintiff testified that there were thousands of valves on the ships on which he worked, that he did not work on every valve on every ship, and that he did not know who manufactured any particular valve. (*Id.*, Ex. C at 267:24-268:1; 268:7-12; 277:2-11) Plaintiff's deposition testimony fails to create a material issue of fact as to whether Neles-Jamesbury products were a substantial contributing factor to Plaintiff's injuries under maritime law. *See Lindstrom*, 424 F.3d at 492.

Additionally, Neles-Jamesbury raises the bare metal defense, which precludes holding Neles-Jamesbury responsible for asbestos-containing products that Neles-Jamesbury did not manufacture, sell, or distribute that were applied to Neles-Jamesbury valves. (D.I. 146 at 12-13); *See Dalton*, 2013 WL 4886658, at \*6-7. Consequently, there is insufficient evidence to maintain the causal nexus required by maritime law, and summary judgment should be granted in Neles-Jamesbury's favor.

## V.   CONCLUSION

For the foregoing reasons, and as addressed in the chart *infra*, the court recommends granting Defendants' motions for summary judgment.

| Defendant | Motion for Summary Judgment |
| --- | --- |
| BorgWarner Morse TEC LLC | GRANT |
| Clayton Industries | GRANT |
| Foster Wheeler LLC | GRANT |
| Gardner Denver Inc. | GRANT |
| General Electric Company | GRANT |
| Genuine Parts Company | GRANT |
| Mack Trucks Inc. | GRANT |

| Marotta Controls Inc. | GRANT |
| National Automotive Parts Assoc. | GRANT |
| Navistar Inc. | GRANT |
| Neles-Jamesbury Inc. | GRANT |

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: October 2, 2017

Sherry R. Fallon
United States Magistrate Judge